UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

CHERYL A. STANKE,

        Plaintiff,

        v.                                           Case No. 08-C-0891

MICHAEL J. ASTRUE,

        Defendant.

DECISION AND ORDER REMANDING THE DECISION OF THE COMMISSIONER

Plaintiff, Cheryl A. Stanke, filed this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423(d). Stanke filed her application on April 22, 2005, alleging an onset date of June 26, 2004, due to cervical disc injuries from a 2003 car accident. Her application was denied initially and upon reconsideration. Administrative Law Judge Margaret O'Grady held a hearing on September 18, 2007, at Stanke's request. Stanke appeared with an attorney, and a vocational expert testified.

The ALJ issued a decision on March 27, 2008, finding that Stanke retained the residual functional capacity to perform a full range of sedentary work, as defined in 20 C.F.R. § 414.1567(a). The Appeals Council denied review, and the ALJ's decision became the final decision of the commissioner. *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

BACKGROUND

Cheryl Stanke, a fifty-one year old wife and mother of three, was injured in an automobile accident in July of 2003. (R. 603-605.) She has an associate degree in business management and previous work experience in accounting. (*Id.*). Stanke suffers from degenerative disc disorder, herniated discs, cervical spondylosis, cervical stenosis, cervical syndrome, chronic pain, hypothyroidism, and carpal tunnel syndrome. (R. 24.)

Stanke saw her family physician, Dr. Joseph G. Trojan, on August 1, 2003, complaining of neck and back pain from the car accident in which she was rear-ended by a semi, slid around the road, spun out, hit several cars, and ended up on a cement embankment. (R. 425.) At the time, her pain was a "six to seven out of ten." (*Id.*) Dr. Trojan maintained Stanke on ibuprofen 600 and Vicodin up to four times a day, and instructed her to remain off work for another entire week. Dr. Trojan offered physical therapy, and Stanke responded that she may seek treatment from her chiropractor. (*Id.*)

Stanke next saw Dr. Trojan on December 19, 2003, when she was complaining of "stabbing pain between her shoulder blades which occurs for several hours." (R. 426.) She reported reaching what she considered to be a "healing plateau." (*Id.*) Dr. Trojan prescribed Bextra and Flexeril, and noted Stanke would continue chiropractic care and physical therapy. (*Id.*)

Stanke was seen again on January 1, 2004, and February 20, 2004, by Dr. Trojan. She complained of pain in her shoulder blades, especially to the left of the thoracic spine, but her neck and lower back were minimally symptomatic. (R. 427.) Dr.

Trojan noted that she could not sit down because of the back pain. ®. 427-28.)  He referred Stanke to Dr. David Coran for an orthopedic opinion and ordered an MRI of the lumbar spine to rule out disc herniation. (R. 428.)  Dr. Trojan continued her work restrictions. (*Id.*)

A February 21, 2004, MRI of Stanke's thoracic spine showed mild degenerative changes with no evidence of spinal cord compromise or neural compromise.  However, there were significant degenerative changes within the cervical spine which was imaged on the margin of the coil. (R. 220.)  A March 3, 2004, MRI of Stanke's cervical spine showed disc herniation at four levels. (R. 201, 218-219.)  Of these four levels, there was no significant narrowing of disc space or effacement (narrowing or shortening) of her spinal cord at one level and mild narrowing of disc space at three levels, with moderate effacement at one of these levels and mild effacement at the remaining two levels. (R. 201, 218-219, 437.)

On March 11, 2004, Dr. Coran examined Stanke and observed mild tenderness of the lower cervican and upper thoracic paraspinal muscles, limited cervical motion, negative straight leg raising tests; and normal reflexes. (R. 437.)  His diagnoses included cervical disc herniations, cervical stenosis, cervical syndrome and radiculitis. (*Id.*)  Dr. Coran recommended an epidural steroid injection series, current medications and current work restrictions.  (*Id.*)

Two weeks later, Dr. Saleem Awan noted a free range of motion in Stanke's neck with pain associated with flexion and extension as well as with right lateral bending.  In addition, there was mild cervical paraspinal muscle spasm and cervical paraspinal tenderness, although the motor and sensory examination was

normal. (R. 201-202.) He diagnosed Stanke with cervical radiculopathy and spondylopathy with multilevel cervical disc herniations. (R. 194, 196.) Dr. Awan treated Stanke with a cervical epidural injection to calm the symptoms down. (R. 201.) However, Stanke displayed no significant improvement after two epidural steroid injections done through the interlaminar approach and underwent diagnostic cervical medial branch blocks. (R. 194.)

On April 27, 2004, Dr. S. Bahal conducted an EMG and nerve conduction study revealing that the right and left median motor and sensory distal latencies were markedly prolonged. He found bilateral carpal tunnel syndrome (moderately severe degree) and superimposed acute bilateral C5-C6 radiculopathy of moderate degree. (R. 224.)

On June 10, 2004, Dr. James Taylor, Stanke's chiropractor, recommended that Stanke take a short term disability leave for three months to allow for healing and to attempt to reach the next healing plateau. (R. 229-230.) The following day, Stanke saw Dr. Trojan and reported that she continued to have pain and continued to work six hours a day at a computer as an accountant. (R. 242.) She reported that Dr. Coran suggested a cervical laminectomy and fusion, but that there was only a 50% chance that the pain would go away. Stanke wanted to pursue other options. (*Id.*) Dr. Trojan recommended a short-term disability for a few months so that she would not be exposed to sitting at a desk in a fixed position for several hours a day and could focus on her chiropractic treatments and physical therapy. (*Id.*)

On September 15, 2004, Stanke reported that she had been off work since June of 2004, and that chiropractic care and fitness training were giving hours of

relief. (R. 241.) Her pain was a four on a ten point scale in the morning, but an eight by the end of the day. (*Id.*) Dr. Trojan extended her leave and continued the Bextra, Flexeril, and Vicodin as needed. (R. 240.)

On February 28, 2005, Dr. Trojan completed a disability insurance form and indicated that he last treated Stanke on July 15, 2004. (R. 232.) He opined that Stanke's C5-C6 disc herniation and cervical radiculopathy severely limited her functional capacity and rendered her incapable of minimal (sedentary) activity. (R. 232.) In addition, he opined that Stanke was able to engage in only limited stress situations and limited interpersonal relations. (*Id.*)

On March 15, 2005, Dr. Hundt noted that Stanke rated her neck and back pain a four on the ten point scale. On March 29, 2005, Dr. Hundt completed a supplemental statement/estimated functional abilities form and concluded that Stanke had severe limitations of functional capacity and was incapable of minimal activity. (R. 233.) Dr. Hundt stated that she could not sit or stand for prolonged periods of time and no longer than one hour at a time. (R. 233.)

On April 19, 2005, Stanke reported that she was doing better but more activity worsened the pain. (R. 238.) She was able to accomplish some tasks, but was still in weekly chiropractor or massage therapy. (*Id.*) Dr. Trojan added an anti-inflammatory to her medications. (R. 239.)

On June 15, 2005, Dr. Pat Chan completed an RFC assessment and concluded that Stanke could occasionally lift twenty pounds, frequently lift or carry ten pounds, stand and/or walk about six hours a day, and sit for a total of six hours. There

5

were no postural, manipulative, visual, cummunicative, or environmental limitations. (R. 264-271.)

On September 19, 2005, Dr. Hundt wrote to Stanke's attorney and opined that Stanke was permanently disabled. (R. 273.) Hundt wrote that Stanke was treated for maintenance purposes only because she would never fully recover from her injuries. (R. 273.)

Seven months later, Kimberly Siegel, a physical therapist, evaluated Stanke at her attorney's request. (R. 297, 301.) Siegel opined that Stanke's workday tolerance could not be enhanced because Stanke could not sit longer than 45 minutes. (R. 297-299.)

Dr. Raether treated Stanke from June 8, 2006, through August 3, 2007. (R. 323.) At her August 3, 2007, appointment, Stanke rated her neck as a three on a scale of one to ten, and her upper and mid thoracics a six. (R. 353.) She reported that too much activity worsened her symptoms, but that treatments and rest improved them. (*Id.*) Dr. Raether reported that Stanke's prognosis was fair because she had experienced mixed results. (R. 353.)

On July 29, 2007, Dr. Trojan completed a RFC questionnaire, and indicated that he saw Stanke every six to twelve months for cervical radiculopathy and a herniated disc. (R. 303.) In his opinion, Stanke's pain was severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks, and that she was incapable of tolerating "low stress" jobs. (R. 304.) Dr. Trojan opined that she could not sit or stand more than 45 minutes at one time, and could sit or stand less than two hours in a working day. (R. 305.) He further opined that Stanke would

6

need to walk around for five minutes at a time every forty-five minutes and take four daily unscheduled breaks for twenty minutes. Dr. Trojan estimated that Stanke would miss more than four days per month. (R. 307.)

Dr. Raether, completing the same questionnaire a week later, opined that Stanke's pain interfered with her concentration to the same degree as Dr. Trojan, and that she could sit for no more than forty-five minutes at a time, stand for no more than twenty minutes at a time, sit or stand for no more than a total of two hours with a sit-stand option at will, and rarely lift or carry up to ten pounds. (R. 319-322.) Dr. Trojan further opined that Stanke would need to walk around for five to ten minutes at a time every thirty minutes, take daily unscheduled breaks every one to two hours for up to ten minutes and miss more than four days of work per month. (R. 320-322.)

During the hearing before the ALJ, Stanke testified that her pain begins the base of her skull, travels down her cervical spine, and continues through her middle and lower back. (R. 606.) The pain radiates into her legs, especially her left leg, several times a week. (*Id.*) Her back and neck pain are constant, but they do vary in intensity dependent upon the level of exertion Stanke endures. (R. 606-607.) She continued to treat with her family physician and chiropractor at the time of the hearing. (R. 613-614.)

Stanke testified that she must lay down, apply ice packs to the painful areas of her neck and back multiple times a day, and takes hydrocodone two to four times per day to alleviate the pain. (R. 606-607.) She added that she also tries to alleviate her pain by seeing a chiropractor on a regular basis and doing stretching exercises at home. (R. 607.)

7

Stanke further testified that she cannot sit for any more than 45 minutes at a time before she must get up, walk around, and try to relieve the stress on her back and neck. (R. 615.) When she does return to sitting, she can only sit for about 35 minutes before the pain is unbearable and then must again walk around or lay down and apply ice packs to her back and neck. (*Id.*) After the initial term of sitting for about 45 minutes, Stanke's ability to sit for any period of time diminishes, until she must lay down with ice packs on her back and neck for a significant period of time to reduce her pain. (*Id.*) Stanke has an inability to focus or concentrate since June 26, 2004. In addition, concentration is difficult, particularly when going through household paperwork, because the pain consumes her thoughts and she loses focus on the task at hand. (R. 611.)

The VE testified at the hearing that Stanke's past relevant work experience as an accountant was highly skilled and sedentary. (R. 626.) In addition, the VE testified that a person with Stanke's vocational background who could perform sedentary work with no more than occasional postural limitations could return to her past relevant work. (R. 628.)

STANDARD OF REVIEW

A district court's review of a social security appeal is limited to determining whether the ALJ's decision is supported by substantial evidence and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th

8

Cir.1998). However, "[i]n coming to his decision ... the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Scheck*, 357 F.3d at 699. Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

The ALJ's decision must also demonstrate the path of reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded. *See Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005); *Zurawski*, 245 F.3d at 889.

ANALYSIS

In support of her request for a remand, Stanke raises a myriad of arguments suggesting that the ALJ's decision is not supported by substantial evidence. For example, she asserts that the ALJ: (1) ignored Dr. Raether's medical records from 2006 and 2007 as well as a functional capacity evaluation and participation summary from Kimberly Siegel, P.T. of Affiliated Health of Wisconsin; (2) failed to mention, review, or discuss the administrative hearing testimony of Stanke's mother-in-law, Pauline Stanke; (3) did not support a finding that no impairment meets or medically equals a listed impairment ; (4) did not support her credibility determination about Stanke's physical abilities and levels of pain; (5)  did not take into consideration the

9

complete testimony of the VE regarding the availability of jobs based on her physical limitations; and (6) relied upon the state agency consultant's reviews which were completed two years prior to the hearing without consideration of all the medical evidence provided by Stanke.

The commissioner maintains that substantial evidence supports the decision inasmuch as the ALJ found that Stanke suffered from a severe combination of impairments and discussed the relevant medical evidence. Similarly, the commissioner maintains that substantial evidence supports the ALJ's RFC determination because the ALJ need only give controlling weight to a treating physician if it is well supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence of record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Finally, the commissioner argues that the ALJ's hypotheticals need not incorporate impairments and limitations that she deems less than credible.

First and foremost, the court is troubled by the ALJ's finding at step three (subparagraph four) where she concluded that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526)." The ALJ proceeded to the next step and concluded that Stanke has the residual functional capacity to perform the full range of sedentary work *without* ever identifying the listing that was being considered or articulating the bases for her conclusion. An ALJ must articulate her assessment of the evidence sufficiently to assure the reviewing court that she considered the important evidence and thereby enable the court to trace the path of reasoning. *See Brindisi ex*

10

*rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (finding that "the omission of any discussion of plaintiff's impairments with the listings 'frustrates any attempt at judicial review.'"). Here, the failure to discuss the evidence in light of the listing's analytical framework leaves the court "with grave reservations as to whether [her] factual assessment addressed adequately the criteria of the listing." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

The commissioner argues that Listing 1.04A was the relevant listing and none of the physicians of record found that Stanke's impairments satisfied all of the requirements. Listing 1.04A covers disorders of the spine, resulting in compromise of a nerve root or the spinal cord, with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04A. Stanke cites evidence in the record that could support a finding that she meets the identified listing, including medical evidence of nerve root compression, limitation of movement of the spine, and motor loss accompanied by sensory or reflex loss. However, the bottom line is that the listing was never identified and it is impossible to trace the reasoning of the ALJ. Hence, remand on this ground is appropriate.

The court is similarly troubled by the lack of substantial evidence supporting the ALJ's RFC determination and findings at step four. For example, the ALJ acknowledged that Stanke's medically determinable impairments could reasonably be expected to produce her alleged symptoms, yet found that Stanke's statements

11

concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were "inconsistent with the residual functional assessment." Although the ALJ's credibility determination is entitled to deference, it "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see also Brindisi*, 315 F.3d at 787 (7th Cir. 2003) (pursuant to SSR 96-7p, ALJ must "articulate the reasons behind credibility evaluations".)

The "inconsistences with the residual functional assessment" are not sufficiently articulated and Stanke's testimony regarding pain is not considered in context of all of the relevant medical evidence in the record. Stanke's testimony was consistent with the testimony of her mother-in-law, who was never mentioned in the decision, as well as Drs. Hundt, Trojan, Raether, and physical therapist, Siegel. While the ALJ may discount such testimony, the summary of Stanke's testimony – "that she is able to care for her own personal hygiene and perform substantially all of her household chores" – omits additional testimony that she engages in such activities on a restricted basis and requires frequent breaks with ice packs.

Importantly, in the paragraph wherein the ALJ discredits Stanke's testimony as not fully supported by her treatment history, the ALJ wrote:

> The medical record reveals that there are no medical
> records for the period after 2005 to support complete
> disability. No records for treatment after 2005 were
> submitted by claimant's attorney, therefore there is no
> support for claimant's condition being continuing or disabling.

12

This is a misstatement of the evidence in the record. There is a cover letter in the record from Stanke's attorney to the ALJ – filed in advance of the hearing – attaching the treatment notes of Dr. Peter Raether from June 8, 2006, through August 3, 2007. (R. 324-353.)

The commissioner admits that the ALJ "could have been clearer in finding that Plaintiff submitted no treatment records after 2005" (Def.'s Mem. in Support, p. 11, n. 2), but argues that the ALJ did consider the treatment notes and simply found that Stanke did not seek treatment from an acceptable medical source. This argument is quite frankly speculation – it was never articulated by the ALJ. The court does not know that the ALJ made this statement because Dr. Raether, a chiropractor, is an "other source" versus an "acceptable medical source, 20 C.F.R. § 404.1515(a) and (d) and SSR 06-03p.

Similarly, there is no mention of a functional capacity evaluation and participation summary completed on April 12, 2006, by Kimberly Siegel, P.T. of Affiliated Health of Wisconsin. After testing, Siegel concluded that the inability of Stanke to sit for more than 45 minutes at a time and her limited ability to move her head and neck did not meet the job demands required of an accountant. (R. 301.) The commissioner suggests that Siegel was an "other source" and offers several reasons why her evaluation could reasonably be rejected. However, these arguments are little more than post hoc rationalizations that are never mentioned by the ALJ.

In addition to the above concerns, the court is unable to find the decision of the ALJ to be based upon substantial evidence where there is no discussion as to

why the opinions of the state agency consultants, who reviewed Stanke's file two years prior to much of the evidence in the record, are weighed more heavily than her treating sources. On remand, proper weight must be given to treating sources with an explanation as to why non-examining medical expert's opinions are valued over the opinions of the examining sources opinions. *See Clifford v. Apfel*, 227 F .3d 863, 870 (7th Cir. 2000) (finding that more weight is generally given to the opinion of the treating physician). Moreover, the court directs the ALJ to reevaluate the hypothetical posed to the VE in light of any new findings.

Now, therefore,

IT IS ORDERED that the commissioner's decision is vacated and remanded back to the commissioner for further proceedings pursuant to sentence four. 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 6th day of July, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE